IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

DESIGN RESOURCES, INC.,           )
                                  )
            Plaintiff,            )
                                  )
     v.                           )          1:10CV157
                                  )
LEATHER INDUSTRIES OF AMERICA,    )
DR. NICHOLAS J. CORY,             )
ASHLEY FURNITURE INDUSTRIES,      )
INC., and TODD WANEK,             )
                                  )
            Defendants.           )


**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

**I.    PROCEDURAL POSTURE**

Plaintiff Design Resources, Inc. ("Plaintiff" or "DRI") has filed a motion for partial summary judgment against Defendant Leather Industries of America ("LIA") on DRI's claims under the Lanham Act (Count I) and the North Carolina Unfair and Deceptive Trade Practices Act (Count II). (Doc. 102.)  LIA has responded (Doc. 129), and Plaintiff has replied (Doc. 141).

DRI also filed a motion for partial summary judgment against Defendant Ashley Furniture Industries, Inc. ("Ashley") on DRI's claims under the Lanham Act (Count I) and the North Carolina Unfair and Deceptive Trade Practices Act (Count II).

(Doc. 104.)  Ashley has responded (Doc. 127), and Plaintiff has replied (Doc. 140).

Defendant LIA has filed a motion for summary judgment on all counts. (Doc. 123.) Plaintiff has responded (Doc. 132), and LIA has replied (Doc. 147).

Defendant Ashley Furniture Industries has filed a motion for summary judgment. (Doc. 119.) Plaintiff has responded (Doc. 133), and Ashley has replied (Doc. 143).  Plaintiff has also filed a surreply to Ashley's summary judgment motion (Doc. 148), which Ashley has moved to strike (Doc. 150).  The motion to strike has been fully briefed.

Also before this court is LIA's motion for leave to file a supplemental brief in support of its motion for summary judgment. (Doc. 154.) Plaintiff DRI has filed a statement of non-opposition to LIA's motion (Doc. 159), and LIA filed a reply (Doc. 164).  That supplemental memorandum will be considered by this court.

Also before the court is DRI's motion for relief from Ashley's Spoliation of Evidence (Doc. 86), Ashley's consent motion for extension of time (Doc. 95) to file a response to DRI's motion for relief, the parties' joint motion to modify limitations on length of summary judgment briefs (Doc. 116), the parties' agreed motion to extend deadline (Doc. 161), Ashley's motion to exclude the expert testimony of Mann, Armistead, and

Epperson (Doc. 170), Ashley's motion to strike untimely expert reports of Mann, Armistead, and Epperson (Doc. 172), LIA's motion to exclude the testimony of DRI's proposed experts (Doc. 175), and Ashley's motion to strike surreply and declaration of Jerry Epperson (Doc. 205).

These motions are now ripe for adjudication. For the reasons that follow, the motions for summary judgment filed by Defendants LIA and Ashley will be granted, DRI's motions for summary judgment will be denied, and the remaining motions will be granted or denied as moot.

## II. **BACKGROUND**

At all times relevant for the present action, Dr. Nicholas Cory was a research scientist and the director of LIA. (DRI's Mem. in Supp. of Mot. for Partial Summ. J. against LIA (Doc. 103) at 2.)[1] LIA operated as a trade association representing leather sellers in the United States, and Dr. Cory headed LIA's research laboratory.[2] (Id.) The action against LIA centers around statements made by Dr. Cory to a trade magazine entitled

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to the page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

[2] There is a factual dispute concerning LIA's ownership of the research laboratory that directly employed Dr. Cory. This court does not find that factual dispute material to this order and therefore reaches its legal conclusions without resolving this factual issue.

<u>Furniture Today</u> concerning the marketing and labeling of bonded leather. Traditionally, "leather" is understood as upholstery derived entirely from the hide of an animal. (<u>See</u> Decl. of Brent F. Powell ("Powell Decl."), Ex. 9, Dep. of Sonny Chris Ross (Doc. 121-9) at 17.) Some companies market and sell a product called bycast (alternatively spelled "bicast"), which is generally lower quality leather coated with polyurethane and printed with a pattern to appear as it is genuine leather. (<u>Id.</u>, Ex. 1, Dep. of Alan Naness (Doc. 121-1) at 4-5.) Originally, bonded leather was a synthetic material with leather fibers glued together to form a complete layer. DRI innovated a new version of bonded leather by attaching leather fibers (not forming a complete layer) to the base, back, or underside of a synthetic furniture covering consisting of a polyurethane face. (Decl. of Alan Naness (Doc. 106) at 1.) DRI banded this new bonded leather product under the name NextLeather®. (<u>Id.</u>)

In December 2006, DRI first contacted Dr. Cory at the research laboratory to ask Dr. Cory if its NextLeather®[3] product could be labeled as leather in the United States. (<u>Id.</u>) Based on the DRI email and without a physical sample of NextLeather®, Dr. Cory responded it could "ABSOLUTELY NOT!" be labeled as leather and that it would have to be called "Bonded leather,"

---

[3] In the email exchange between DRI and Dr. Cory, DRI refers to its product as Veneto. Veneto was the name DRI used before branding its product as NextLeather®.

"Reconstituted leather," or "Not leather" under the applicable Federal Trade Commission's ("FTC") regulations. (Decl. of Cameron R. Argetsinger ("Argetsinger Decl."), Ex. 7, Email Conversations between Nicholas Cory and Dan Peplinski (Doc. 125-1) at 79.) Dr. Cory further offered to have his research laboratory perform a chemical analysis to determine the percentage of leather fibers used in NextLeather® (a bonded leather labeling requirement under the FTC regulations). (Id.)

In the fall of 2006, Ashley began to run a series of advertisements under the caption "Caveat Emptor." (Powell Decl., Ex. 7, Dep. of Kenneth Lebensberger (Doc. 121-7) at 15.) According to Ashley, "Caveat emptor was one of our responses to the amount of importing that retailers were doing." (Id.) DRI's claims against Ashley stem from one ad in the Caveat Emptor series. Specifically, in March 2007, Ashley ran a Caveat Emptor ad entitled "Is It REALLY LEATHER?" (Powell Decl., Ex. 14, Flyer (Doc. 121-14) at 2.)  The ad described the practice of "[s]ome upholstery suppliers" who were "using leather scraps that are mis-represented as leather; adding a denim barrier to this material and using it for bicast, and as corrected grain leather in locations where you would expect top grain." (Id. at 3.) The ad concludes with the warnings "Know What You Are Buying" and "REMEMBER...The Overseas Manufacturer Has NO Liability In The U.S.A. YOU DO!" (Id.) Ashley claims it was not aware that DRI

sold bonded leather until May 2007, over two months after the ad first ran. (Powell Decl., Ex. 8, Dep. of Lisa Adair (Doc. 121-8) at 5.) Moreover, Ashley contends that the advertisement refers to a "tricast" product produced in China consisting of "glued-together leather 'scraps' for backing material" as opposed to NextLeather®'s "ground-up leather 'shavings.'" (Def. Ashley's Br. in Supp. of Mot. for Summ. J. (Doc. 122) at 12.)

Although the Caveat Emptor ads never mention NextLeather® or DRI by name, DRI contends that "Ashley repeatedly ran ads in Furniture Today which specifically targeted DRI and falsely stated that NextLeather® was being marketed as 'bonded leather' in violation of federal law." (DRI's Resp. to Def. Ashley's Mot. for Summ. J. (Doc. 133) at 9-10.) DRI further claims that Ashley purposefully ran these ads to coincide with the High Point, North Carolina furniture market, a critical forum where retailers make a large proportion of purchasing decisions. (Id. at 10.)

In June 2007, Ashley specifically asked Dr. Cory if it could market and label a bonded leather product similar to NextLeather® as bonded leather. Dr. Cory responded it would be deceptive to label such a product as bonded leather. (Argetsinger Decl., Ex. 12, Evaluation of Synthetic Leather Material (Doc. 125-2) at 4.) At the request of Ashley, Dr. Cory conducted an interview with Furniture Today to warn of the

potential confusion from labeling these new products (consisting of leather scraps glued to the underside of a synthetic cover) as bonded leather. (Id., Ex. 13 at 8-9; Decl. of John R. Neeleman ("Neeleman Decl."), Ex. M-3, Email Conversation (Doc. 107-4) at 19.)

The two statements DRI relies upon as the basis of its claims against LIA are found in two separate Furniture Today articles. The first article, dated July 2, 2007, was written by Joan Gunin (the "Gunin article") and titled "Chemist fears confusion over imitators may hurt category." (Complaint ("Compl."), Ex. E, Gunin article (Doc. 1-6) at 2-3.) DRI relies on the following passage from the Gunin article: "'To call it "leather" is outright deception, outright fraud,' said Cory, director of the Leather Research Laboratory at the University of Cincinnati, of bonded leather. 'It's not real leather . . . . It's a synthetic that has leather fibers glued to the underside.'" (Id. at 2.) The second article, dated July 9, 2007, was written by Susan M. Andrews (the "Andrews article") and entitled "For consumers' sake, let's not call it 'bonded leather.'" (Id., Ex. J, Andrews article (Doc. 1-11) at 2.) In the Andrews article, Dr. Cory is quoted as stating "calling these products bonded leather 'is deceptive because it does not represent its true nature. It's a vinyl, or a polyurethane

laminate or a composite, but it's not leather. If you tar and feather someone, does that make them a chicken?'" (Id.)

Dr. Cory never referred to NextLeather® or DRI by name in either of his interviews. A product unaffiliated with DRI named "Oekopelle" was the only product specifically mentioned in either article. (Id.) During 2007-08, Furniture Today published at least thirteen other articles concerning bonded leather without quoting Dr. Cory. (See Argetsinger Decl., Exs. 20-22 (Doc. 125-2) at 35-40; Exs. 23-32 (Doc. 125-3) at 2-30.) Many of these articles focused on the deceptive nature of the "bonded leather" label. (See id.)

On May 23, 2007, the FTC made public requests for comments on the regulations published by the FTC, including those regulations governing the sale and marketing of leather (the "FTC Leather Guides"). (See Id., Ex. 19, 73 Federal Register 34626 (Doc. 125-2) at 29-33.) Under the FTC Leather Guides, "[a] material in an industry product that contains . . . bonded leather and thus is not wholly the hide of an animal should not be represented, directly or by implication, as being leather."

16 C.F.R. § 24.2(f).[4] Pursuant to Dr. Cory's advice, LIA submitted comments seeking to clarify whether the practice of adhering leather fibers to the bottom of a synthetic product (as opposed to leather fibers glued together to form a continuous layer) could be marketed as bonded leather. (See Argetsinger Decl., Ex. 19, 73 Federal Register 34626 (Doc. 125-2) at 29-33.) In June 2008, the FTC retained the Leather Guides without change, concluding that the Leather Guides' provision requiring disclosure of the leather fiber content provided adequate information to consumers. (Id. at 32.)

---

[4] The entire FTC regulation appears as follows:

(f) Ground, pulverized, shredded, reconstituted, or bonded leather. A material in an industry product that contains ground, pulverized, shredded, reconstituted, or bonded leather and thus is not wholly the hide of an animal should not be represented, directly or by implication, as being leather. This provision does not preclude an accurate representation as to the ground, pulverized, shredded, reconstituted, or bonded leather content of the material. However, if the material appears to be leather, it should be accompanied by either:

(1) An adequate disclosure as described by paragraph (a) of this section; or

(2) If the terms "ground leather," "pulverized leather," "shredded leather," "reconstituted leather," or "bonded leather" are used, a disclosure of the percentage of leather fibers and the percentage of non-leather substances contained in the material. For example: An industry product made of a composition material consisting of 60% shredded leather fibers may be described as: Bonded Leather Containing 60% Leather Fibers and 40% Non-leather Substances.

## III. **LEGAL STANDARD**

A motion for summary judgment is appropriately denied when an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates a genuine issue of material fact exists. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). In considering a motion for summary judgment, the court is not to weigh the evidence, but rather must determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The court must view the facts in the light most favorable to the nonmovant, drawing inferences favorable to that party if such inferences are reasonable. Id. at 255. However, there must be more than a factual dispute; the fact in question must be material, and the dispute must be genuine. Id. at 248. A dispute is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"When faced with cross motions for summary judgment, as in this case, the court must consider 'each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" Pediamed Pharm., Inc. v. Breckenridge Pharm., Inc., 419 F. Supp. 2d 715, 723 (D. Md. 2006) (quoting Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)). "The court must deny both motions if it finds there

is a genuine issue of material fact, but if there is no genuine

issue and one or the other party is entitled to prevail as a

matter of law, the court will render judgment." Id. (internal

quotation marks omitted).

**IV.  ANALYSIS**

DRI has moved for summary judgment on its claims against

LIA and Ashley under the Lanham Act and the North Carolina

Unfair and Deceptive Trade Practices Act. LIA has moved for

summary judgment on all nine counts asserted against it, and

Ashley has done the same on all six counts asserted against it.

**A.  Lanham Act (Count I)**

To maintain its claim under the Lanham Act against either

Defendant, 15 U.S.C. § 1125(a), DRI must prove that:

> [1] the [D]efendant made a false or misleading
> description of fact or representation of fact in a
> commercial advertisement about his own or another's
> product; (2) the misrepresentation is material, in
> that it is likely to influence the purchasing
> decision; (3) the misrepresentation actually deceives
> or has the tendency to deceive a substantial segment
> of its audience; (4) the [D]efendant placed the false
> or misleading statement in interstate commerce; and
> (5) the plaintiff has been or is likely to be injured
> as a result of the misrepresentation, either by direct
> diversion of sales or by a lessening of goodwill
> associated with its products.

Scotts Co. v. United Indus. Corp., 315 F.3d 264, 272 (4th Cir.

2002) (citation omitted).

DRI contends it has, at the very least, raised a genuine

issue of material fact as to each element of its Lanham Act

claim. LIA counters that DRI is unable to carry its burden on any of these elements. Without having to reach each argument raised by LIA, DRI's claim under the Lanham Act must fail because Dr. Cory's statements were not false or misleading statements of fact.

"For liability to arise under the false advertising provisions of the Lanham Act, 'the contested statement or representation must be either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context.'" Id. at 272-73 (quoting C.B. Fleet Co. v. SmithKline Beecham Consumer Healthcare, 131 F.3d 430, 434 (4th Cir. 1997)). "'In analyzing whether an advertisement . . . is literally false, a court must determine, first, the unambiguous claims made by the advertisement . . . , and second, whether those claims are false.'" Id. at 274 (quoting Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co., 290 F.3d 578, 586 (3d Cir. 2002)).

"Where the advertisement is literally false, a violation may be established without evidence of consumer deception." Scotts Co., 315 F.3d at 273 (internal quotation marks omitted). "A literally false message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." Id. at 274 (internal

quotation marks omitted). "Whether an advertisement is literally false is an issue of fact." <u>C.B. Fleet Co.</u>, 131 F.3d at 434.

### i.  **The Gunin Article**

DRI contends the following quote from the Gunin article is literally false or, alternatively, deceived customers: "'To call it "leather" is outright deception, outright fraud,' said Cory, director of the Leather Research Laboratory at the University of Cincinnati, of bonded leather. 'It's not real leather . . . . It's a synthetic that has leather fibers glued to the underside.'" (Declaration of Kristin Beneski, Gunin article, Ex. J-1 (Doc. 134-7) at 28.) The FTC Leather Guides unambiguously prohibit representing bonded leather as simply "leather." 16 C.F.R. § 24.2(f). Moreover, DRI has admitted that describing NextLeather® by the unqualified term "leather" would be both false and misleading. (Argetsinger Decl., Ex. 8, Def. LIA's First Set of Requests for Admission, Nos. 15 & 16 (Doc. 125-1) at 88.) Based on the above admissions, DRI has not created a disputed factual issue. Further, in light of the governing FTC Leather Guides' provisions, no reasonable juror could find the above quote literally false.

DRI argues that the "necessary implication of Cory's statements is that it is deceptive and fraudulent to sell bonded leather as such because the phrase contains the word 'leather.'" (DRI.'s Reply in Supp. of Mot. for Partial Summ. J. against Def.

LIA (Doc. 141) at 10.) This argument misses the mark. "A claim is conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 35 (1st Cir. 2000). For instance, when an advertisement claimed "motor oil provided 'longer engine life and better engine protection' without explicitly mentioning competitors [it] nonetheless drew a comparison by necessary implication vis à vis those competitors." Id. (quoting Castrol Inc. v. Pennzoil Co., 987 F.3d 939, 941, 946 (3d Cir. 1993)). Unlike the implicit comparison to unnamed competitors in Castrol, nothing in Dr. Cory's quote necessarily implies the strained reading DRI would have this court adopt. The literal language of the quote is a true statement by Dr. Cory that calling bonded leather by the unqualified term "leather" was deceptive and fraudulent.[5]  No reasonable juror could conclude that Dr. Cory's statement necessarily implies the attenuated reading DRI currently advances.

---

[5]  Dr. Cory's statement was quoted in an article which was published on July 2, 2007, after the FTC's requests for public comment and before the Leather Guides were retained without change in June, 2008.  The comment was a correct conclusion from the applicable regulations both existing and as ultimately retained.

DRI alternatively argues that if the statements were not literally false, the statements were deceptive as "many [customers] refused to purchase bonded leather due to their perception that they could face legal liability for selling it." (DRI's Mem. in Supp. of Mot. for Partial Summ. J. against LIA (Doc. 103) at 16.) When faced with a claim of literal truth but implied deception, "the court's reaction [to the statements] is at best not determinative and at worst irrelevant." Am. Home Prods. Corp. v. Johnson & Johnson, 577 F.2d 160, 166 (2d Cir. 1978). To prove implied deception, "a plaintiff must demonstrate, by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse consumers." Scotts Co., 315 F.3d at 273 (internal quotation marks omitted); see Clorox, 228 F.3d at 36 (requiring that a "substantial portion" of consumers be misled to support a claim for a misleading advertisement under the Lanham Act) (quoted and cited favorably in Scotts). While "[c]onsumer confusion is most often provided by consumer survey data," Scotts Co., 315 F.3d at 276 (internal quotation marks omitted), "survey evidence is not necessarily the best evidence of actual confusion and surveys are not required to prove likelihood of confusion." Tools USA & Equip. Co. v. Champ Frame Straightening Equip., Inc., 87 F.3d 654, 661 (4th Cir. 1996) (internal quotation marks omitted).

DRI supports its claim of consumer confusion with the deposition testimony of Martin Silver and Harley Greenfield. DRI asserts that "Silver and Greenfield's testimony establishes that customers were actually deceived by the smear campaign, as many of them refused to purchase bonded leather due to their perception that they could face legal liability for selling it." (DRI's Resp. to Def. LIA's Mot. for Summ. J. (Doc. 132) at 25.) Ultimately, these depositions fail to provide the requisite showing of customer confusion. During Silver's deposition, he testified that consumers generally "weren't confused about the product [bonded leather]." (Am. Ex. 6, Dep. of Martin Silver ("Silver Dep.") (Doc. 153-2) at 85.) Silver stated that retailers "loved the product [bonded leather]" but "they got this controversy and stuff in the thing you're being deceptive. They didn't want to get involved in it." (Id.) Silver's multiple references to confusion surrounding bonded leather fail to link Dr. Cory's statements to such confusion. Specifically, Silver was only able to name one retailer — Macy's — that refused to purchase bonded leather because of the general controversy surrounding it in the Spring of 2007. (Id. at 85-86.) However, the majority of the testimony concerning Macy's relies on hearsay, and, further, it in no way connects Dr. Cory's quotes to the failure to purchase. See Maryland Highways Contractors Ass'n, Inc. v. Maryland, 933 F.2d 1246, 1251 (4th Cir. 1991)

("[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment."). Even assuming (1) DRI could draw the requisite link between Dr. Cory's quote and Macy's refusal to purchase, (2) the testimony about Macy's refusal to purchase would be admitted over a hearsay objection, and (3) Macy's refusal to buy bonded leather resulted from being misled by Dr. Cory's statements, DRI would still fall far short of raising a genuine issue as to whether Dr. Cory's statement misled a "substantial portion of consumers."

Greenfield's deposition is similarly unhelpful to DRI's position. Greenfield testified that he likely would have read both the Andrews and the Gunin articles but did not recall with certainty. (Am. Ex. 5, Dep. of Harley Greenfield ("Greenfield Dep.") (Doc. 153-1) at 27–30.) At no point during the course of Greenfield's deposition did he identify a single instance of a potential bonded leather customer who was confused by or based a purchasing decision on Dr. Cory's statements to Furniture Today.

Dr. Cory's statement that calling bonded leather by the term "leather" is deceptive is, ultimately, an accurate statement under the FTC Leather Guides. DRI has made no showing of admissible evidence linking the quote in the Gunin article with a single customer's refusal to purchase NextLeather® or general customer confusion about Dr. Cory's statements. Without a preliminary showing of misled customers, no material issue for

trial exists, and summary judgment must be granted in favor of LIA.

### ii.  **The Andrews Article**

In the Andrews article, Dr. Cory is quoted as stating, "calling these products bonded leather 'is deceptive because it does not represent its true nature. It's a vinyl, or a polyurethane laminate or a composite, but it's not leather. If you tar and feather someone, does that make them a chicken?'" (Compl., Ex. J, Andrews article (Doc. 1-11) at 2.)  DRI argues that this quote is literally false because the FTC regulations were clear at the time the statement was given. Therefore, DRI argues, Dr. Cory knew the labeling was lawful, rendering such statements literally false at the time they were made. This court disagrees with DRI's characterization of Dr. Cory's quote and finds such statement to be an expression of opinion by Dr. Cory, not an assertion of fact. Moreover, even stretching the reading of this quote to be a factual representation of the legal status of marketing bonded leather as such, it would still constitute a protected lay opinion unactionable under the Lanham Act.

As a general matter, statements of opinion are not actionable under the Lanham Act. See Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1311 (11th Cir. 2010); Pizza Hut, Inc. v. Papa John's Int'l, Inc., 227 F.3d 489, 496 (5th Cir. 2000);

Nutrition & Fitness, Inc. v. Mark Nutritionals, Inc., 202 F. Supp. 2d 431, 435 (M.D.N.C. 2002). "[T]he distinction between opinion and fact is a matter of law." Ollman v. Evans, 750 F.2d 970, 978 (D.C. Cir. 1984) (en banc). "Although the fact or opinion question can be a difficult one," Koch v. Goldway, 817 F.2d 507, 509 (9th Cir. 1987), the case at bar does not present such difficulties. "Statements not themselves factual, and which do not suggest that a conclusion is being drawn from facts not disclosed in the statement, are commonly statements of opinion, not fact." Id. (citing Restatement (Second) of Torts § 566 (1977)); see Pizza Hut, 227 F.3d at 496 ("[A] statement of fact is one that (1) admits of being adjudged true or false in a way that (2) admits of empirical verification." (alteration in original) (internal quotation marks omitted)). The Andrews article clearly and accurately described the composition of bonded leather. The article has no discussion of legal liability generally or NextLeather® specifically. As the article makes clear, "[t]he term 'bonded leather' is convenient shorthand within the industry, but it's bound to confuse consumers who are likely to hear only the word 'leather.'" (Compl., Ex. J, Andrews article (Doc. 1-11) at 2.) Based on these observations, Dr. Cory is quoted as saying that the term bonded leather being used to describe these products "is deceptive." The disclosed facts and larger context of the article demonstrate that Dr. Cory was

giving his opinion on how a customer would perceive the term
bonded leather. Dr. Cory's claim that customers would likely be
deceived by the labeling is not akin to those claims that can be
"adjudged true or false" based on "empirical verification." Dr.
Cory did not claim to know the law, did not reference the law,
and did not maintain that using such term would result in legal
liability.

DRI further argues that the quote from the Andrews article
is literally false because the necessary implication of "Cory's
statements is that it is deceptive and fraudulent to sell bonded
leather as such because the phrase contains the word 'leather.'"
(DRI's Resp. to Def. LIA's Mot. for Summ. J. (Doc. 132) at 23-
24.) This court rejects such a strained reading of the quote's
implications, especially in light of the article's context and
its failure to mention NextLeather® or DRI as discussed above.
However, even assuming DRI is correct and Dr. Cory's quote
operates as a legal conclusion interpreting the propriety of
NextLeather®'s labeling under the FTC Leather Guides, LIA is
still entitled to summary judgment. While not yet decided by the
Fourth Circuit, several courts have held that "[a]bsent a clear
and unambiguous ruling from a court or agency of competent
jurisdiction, statements by laypersons that purport to interpret
the meaning of a statute or regulation are opinion statements,
and not statements of fact." Coastal Abstract Serv., Inc. v.

First Am. Title Ins. Co., 173 F.3d 725, 731 (9th Cir. 1999); see

Dial A Car, Inc. v. Transp., Inc., 82 F.3d 484, 488-89 (D.C.

Cir. 1996) (noting the law must be clear at the time of the

alleged misstatements); Sandoz Pharm. Corp. v. Richardson-Vicks,

Inc., 902 F.2d 222, 230-32 (3d Cir. 1990). Adhering to such a

rule prevents "transforming the Lanham Act into a handy device"

allowing (or forcing) federal judges to interpret or decide

questions of administrative law. See Dial A Car, 82 F.3d at 489-

90. Here, final FTC guidance on the labeling question did not

come until well after Dr. Cory's quotes in Furniture Today.

Notably, Dr. Cory's statements were made while the issue was

under consideration by the FTC.  Even adopting DRI's

interpretation of the quote found in the Andrews article,

Dr. Cory's statements at most represented a lay opinion on an

unsettled matter of law.  Therefore, summary judgment must be

granted in favor of LIA on the Lanham Act claim (Count 1).

Based on the above findings, this court declines to decide

the questions of whether Dr. Cory's statements were in reference

to NextLeather® or whether such statements constituted

"commercial advertisements" under the Lanham Act.

### iii. Caveat Emptor Ads

Ashley argues that the "Is It REALLY LEATHER?" ad in its

"Caveat Emptor" series is not literally or impliedly false. DRI

contends the "Is It REALLY LEATHER?" ad is literally false by

necessary implication or, alternatively, impliedly false because
it misled consumers.

### a.  **Falsity By Implication**

As stated above, "[a] literally false message may be either
explicit or conveyed by necessary implication when, considering
the advertisement in its entirety, the audience would recognize
the claim as readily as if it had been explicitly stated."
Scotts Co., 315 F.3d at 274 (internal quotation marks omitted).
"Whether an advertisement is literally false is an issue of
fact." C.B. Fleet Co., 131 F.3d at 434.

Here, DRI appears to concede that the "Is It REALLY
LEATHER?" ad is not explicitly false. (DRI's Resp. to Def.
Ashley's Mot. for Summ. J. (Doc. 133) at 27.) Rather, under a
necessary implication theory of literal falsity, DRI argues that
"[t]he ads were literally false because they warned potential
purchasers of bonded leather to beware of upholstery suppliers
who 'are using leather scraps that are misrepresented as
leather[.]'" (Id. at 28.) Because DRI never labeled NextLeather®
as "leather," but always labeled it as "bonded leather," (id.),
the argument concludes that Ashley's "Is It REALLY LEATHER?" ad
was literally false. This argument relies on the critical
assumption that Ashley's reference to bonded leather referred
specifically and exclusively to NextLeather®.  To support this
portion of the argument, DRI states, without citation, that "all

informed readers of the advertisements knew they referred to bonded leather, *i.e.*, NextLeather®." (Id. at 29.)

Untangling all of the inferences DRI's conclusion ultimately rests upon, this court finds no genuine issue as to the literal falsity of Ashley's ad. Courts have been reluctant to draw hidden conclusions of literal falsity based on unsupported inferences. See United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1181 (8th Cir. 1998) ("The greater the degree to which a message relies upon the viewer or consumer to integrate its components and draw the apparent conclusion, however, the less likely it is that a finding of literal falsity will be supported."); see also Scotts Co., 315 F.3d at 274 ("[T]he sheer complexity of [plaintiff's] explanation as to why this case involves a literal falsity seems to undercut the argument."); id. ("A literally false message may be . . . conveyed by necessary implication when . . . the audience would recognize the claim as readily as if it had been explicitly stated." (internal quotation marks omitted)).

Here, a reader of Ashley's ad would have had to make at least two sizeable inferences to arrive at DRI's conclusion. Because the "Is It REALLY LEATHER?" ad does not use the term "bonded leather," the reader would first have to ascertain that

the ad references bonded leather, as opposed to bicast or any

other similarly produced products. To make this inferential

leap,[6] DRI cites its self-proclaimed "smoking gun," (DRI's Resp.

to Def. Ashley's Mot. for Summ. J. (Doc. 133) at 27), a

Furniture Today article dated March 30, 2007, where the author

simply states "Ashley is urging buyers to 'be aware' of bonded

---

[6] In a separate section of DRI's brief, it mentions Ashley's
expert report (the "Klein report") to support its proposition
that "informed readers of the ads understood them to be about
bonded leather, *i.e.*, NextLeather® . . . ." (DRI's Resp. to Def.
Ashley's Mot. for Summ. J. (Doc. 133) at 30.)  The Klein report
sampled members of the furniture community to get their
perceptions of the meaning of Ashley's "Is It REALLY LEATHER?"
ad. The Klein report showed that respondents to the
questionnaire generally understood the Ashley ad to be a warning
about bonded leather. (Id. at 19.) Drawing reasonable inferences
in favor of DRI, this court would be willing to entertain an
argument that the Klein report bridged the gap between the
Ashley advertisement and bonded leather. However, when faced
with literal falsity's mandate that a reader "recognize the
claim as readily as if it had been explicitly stated," Scotts
Co., 315 F.3d at 274, the second inferential leap proves an
insurmountable hurdle to reach DRI's literal falsity conclusion.

leather." (Neeleman Decl., Ex. W (Doc. 107-7).)[7] Having read the

March 30th article "linking" Ashley's ads to bonded leather, a

hypothetical reader would then have to infer that the ad was

referring solely to DRI's NextLeather®. This last logical jump

would truly be a feat, as it would require ignoring the other

---

[7] In its response brief, DRI glaringly misquotes the article as saying that "Ashley executive Tom Leon expressly linked the "Is it Really Leather?" ads to bonded leather. He stated that he perceived bonded leather 'as a threat, a falsehood and a fraud.'" (DRI's Resp. to Def. Ashley's Mot. for Summ. J. (Doc. 133) at 27 (emphasis added).)  The article actually states that "bonded leather . . . is perceived by some as a threat, a falsehood and a fraud." (See http://www.furnituretoday.com/article/412801-bonded-product-among-new-twists-in-leather.) This quote is unambiguously attributable to the author of the article and not the Ashley executive.  The nature of the misquote, while not to be minimized in its own right, is exponentially compounded by the fact that DRI inexplicably filed this Furniture Today article under seal.  (Ex. W (Doc. 107-7).) To further exacerbate the problem, DRI filed the document under seal incorrectly, not providing this court with any accessible version of the article through CM/ECF. This court only uncovered the misquote by obtaining a copy of the article through the Furniture Today public website.  This court will address the motion to seal in a separate order; however, this court views counsel's actions as careless at best and intentionally misleading at worst.

companies explicitly mentioned in the March 30th article.[8] (See
http://www.furnituretoday.com/article/412801-bonded-product-
among-new-twists-in-leather ("At the promotional end, companies
like Klaussner and Catnapper have added bonded leather, which
contains 10% to 17% leather" . . . "And bonded leather isn't
relegated to mainstream merchandise only. Simon Li/Trayton
America has introduced a reconstituted product."); see also
Neeleman Decl., Ex. X, Klein Report (Doc. 107-7) at 38–39
(noting that of the 205 respondents, zero responded that the "Is
It REALLY LEATHER?" ad implied or suggested that DRI or
NextLeather® was the supplier of the material described in the
"Is It REALLY LEATHER?" ad)).

In light of the disconnect between the language of the
advertisement and the "false" message DRI claims it conveys,
coupled with the complete lack of evidence of any DRI customer

---

[8] Here, the requisite logical inferences necessary to reach
DRI's conclusion become even more complex. This court is aware
that DRI operated as a developer and supplier of upholstery to
manufacturing companies, such as Klaussner and Catnapper. So it
is at least theoretically possible that DRI supplied the bonded
leather to the manufacturers cited in the article. However, DRI
first introduced its bonded product in March of 2007 at the High
Point furniture market. At the time of the March 30th article,
these manufacturers would have had to acquire their bonded
leather from a different supplier or produced it in-house.
Either way, it is clear they did not get their bonded leather
from DRI, strongly undermining DRI's contention that bonded
leather and NextLeather® were synonymous during the time period
in question. During Silver's deposition, he claimed he did not
know where Klaussner or Catnapper sourced their bonded leather
from. (Am. Ex. 6, Silver Dep. (Doc. 153-2) at 77.)

perceiving the ad's embedded "false" message, summary judgment must be granted in favor of Ashley. Ultimately, DRI has not presented this court with evidence sufficient to create a genuine issue of material fact concerning the literal falsity of Ashley's "Is It REALLY LEATHER?" ad.

### b. **Implied Falsehood**

As stated above, to prove implied falsehood, "a plaintiff must demonstrate, by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse consumers." Scotts Co., 315 F.3d at 273 (internal quotation marks omitted). While "[c]onsumer confusion is most often provided by consumer survey data," id. at 276 (internal quotation marks omitted), "survey evidence is not necessarily the best evidence of actual confusion and surveys are not required to prove likelihood of confusion." Tools USA, 87 F.3d at 661 (internal quotation marks omitted).

DRI has not provided this court with any evidence rebutting Ashley's showing that not so much as a single consumer was misled by the "Is It REALLY LEATHER" ad. Without citing any specific portion of either deposition, DRI makes the blanket assertion that "Silver and Greenfield's testimony establishes that customers were actually deceived by the ads, as many of them refused to purchase bonded leather due to their perception that they could face legal liability for selling it." (DRI's

Resp. to Def. Ashley's Mot. for Summ. J. (Doc. 133) at 31.) DRI further argues that the Klein report "confirms that informed readers of the ads understood them to be about bonded leather, *i.e.*, NextLeather® . . . ." (Id. at 30.) This court will address each of these assertions in turn.

First, Greenfield, when presented with the Ashley "Is It REALLY LEATHER" ad stated that "[t]his didn't influence us one way or another, except that it opened our eyes."  (Am. Ex. 5, Greenfield Dep. (Doc. 153-1) at 18.)  When asked about the market reaction to the ad, Greenfield responded it was a "[h]ot subject" and that "everyone was talking about it." (Id. at 25.) With respect to bonded leather, Greenfield stated that "people were [either] into it or afraid to be into it." (Id.) Greenfield also asserted that the ad in no way influenced his company's operations at the time. When asked if the ad was "misleading or deceptive," Greenfield responded, "I just viewed it as their [Ashley's] opinion." (Id. at 55.) Nothing in Greenfield's deposition could reasonably be construed to support the argument that a single customer, much less a substantial portion of consumers, was misled or confused by the ad. Moreover, Greenfield's deposition fails to draw even a remote link between

bonded leather and NextLeather®, much less establish that the two terms were synonymous.[9]

Silver's deposition similarly fails to present any evidence of market confusion with respect to NextLeather®. Without referencing any specific potential customer who was deceived by the ad, Silver stated that the ad "was misleading and false in its premise." (Am. Ex. 6, Silver Dep. (Doc. 153-2) at 26.) Silver went on to state that "this whole barrage of newspaper articles and allegations and misleading what they were presenting and accusing Alan of were totally wrong. But they had the effect of frightening people who make the decision to buy the product and so it put a dampening or tampered down the initiative of the purchases." (Id. at 47.) As discussed above, Silver's testimony about Macy's refusal to purchase bonded leather is largely inadmissible hearsay, does not link the Ashley ad to the refusal to purchase, and certainly has not been shown to represent a substantial portion of consumers. (See id. at 86-87.) After being asked if he was "misled or confused by

---

[9] The failure to establish this evidentiary link is notable in light of the fact that as DRI, and others, introduced their bonded leather product, the FTC was also considering , and had requested public comment on, whether the regulations should be amended.

[the Ashley] advertisement," Mr. Silver responded "No. I clearly knew that this was a lie." (Id. at 110.)[10]

Without weighing credibility, this court finds that Silver's testimony, alone or considered with the other evidence, does not demonstrate Ashley's "Is It REALLY LEATHER?" ad misled any actual consumers about NextLeather® or DRI. DRI's showing falls well short of the requisite showing of consumer confusion necessary at this stage of the litigation. See First Health Grp. Corp. v. United Payors & United Providers, Inc., 95 F. Supp. 2d 845, 849 (N.D. Ill. 2000), aff'd sub nom. First Health Grp. Corp. v. BCE Emergis Corp., 269 F.3d 800 (7th Cir. 2001) ("[P]roof of actual or likely confusion of a significant portion of consumers requires a survey or at least some other persuasive means. The personal opinion of an expert as to what a consumer would understand is not enough."); cf. Millennium Imp. Co. v. Sidney Frank Importing Co., Inc., No. CIV. 03-5141 JRT/FLN, 2004 WL 1447915, at *5 (D. Minn. June 11, 2004) ("[P]roof that the advertising actually conveyed the implied message and thereby deceived a significant portion of the recipients becomes critical, and the ultimate success of the claim usually turns on the persuasiveness of a consumer survey."). At this stage of the

---

[10] Mr. Silver's statements contain a number of conclusory comments for which no factual basis is readily apparent. For example, his reference to "Alan" is presumably to Alan Naness of DRI. As discussed previously, any link between Mr. Naness, DRI and the articles has not been established on this evidence.

litigation, Silver's vague references to general market confusion will not suffice. Even assuming portions of Mr. Silver's deposition can be read to support an inference of widespread customer confusion based on Ashley's ad, these portions are uniformly speculative, as Mr. Silver repeatedly admitted that he lacked knowledge of other furniture industry company's operations. (See Am. Ex. 6, Silver Dep. (Doc. 153-2) at 73, 77, 78, 79, 82, 83, 108); see also Wright v. Wolpoff & Abramson, No. 99-1762, 2000 WL 223341, at *1 (4th Cir. Feb. 28, 2000) ("Given his deposition testimony to the contrary, we find that [the] conclusory assertions and unsubstantiated speculation . . . are insufficient to stave off summary judgment.").

DRI further cites Ashley's expert report (the "Klein report") to support its proposition that "informed readers of the ads understood them to be about bonded leather, *i.e.*, NextLeather® . . . ." (DRI's Resp. to Def. Ashley's Mot. for Summ. J. (Doc. 133) at 30.) The Klein report showed that respondents to the questionnaire generally understood the Ashley ad to be a warning about bonded leather. (Neeleman Decl., Ex. X, Klein Report (Doc. 107-7) at 39.) However, the same report undermines the critical assumption DRI's entire argument is premised on — namely, bonded leather and NextLeather® were synonymous. (See id. at 38-39 (noting that of the 205

respondents, zero responded that the ad implied or suggested that DRI or NextLeather® was the supplier of the material described in the "Is It REALLY LEATHER?" ad).) More fundamentally, the Klein report is wholly removed from the question of consumer confusion. In sum, DRI has failed to show any evidence of consumer confusion; the Klein report does not fill that void.

Because DRI has failed to carry its burden to prove consumer deception, a grant of summary judgment in favor of Ashley on the Lanham Act claim is appropriate. DRI's arguments that Ashley's republication of the Gunin and Andrews articles also violates the Lanham Act fail for the same reasons discussed above.[11] See supra Sections IV.A.i & ii.

**B.    State Law Claims**

DRI brings several state law claims against LIA under both North Carolina and Washington law (Counts II through VIII). DRI also brings several claims under North Carolina law against Ashley (Counts II through V). In its opinion denying LIA's 12(b)(6) motion, this court found that "a more fully developed

_____

[11] This court is aware that standing under the Lanham Act was impacted by the Supreme Court's decision in Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S.____, 134 S. Ct. 1377 (2014). Because this court finds DRI's Lanham Act claim deficient, this court can sufficiently resolve summary judgment without having to reopen briefing on the standing issue. Likewise, this court declines to reach the question of whether the Ashley ads were "commercial advertisements" for purposes of the Lanham Act.

factual record would aid [the] court in evaluating the choice of law issues" and, therefore, declined to decide the matter at that early stage in the proceedings. (Mem. Op. & Order (Doc. 55) at 21.) While DRI and LIA still dispute which state's law is applicable to DRI's claims, Ashley has accepted Plaintiff's election of North Carolina law. (Id.); see Vanderhoof-Forschner v. McSweegan, Nos. 99-1615, 99-1616, 2000 WL 627644, at *2 n.3 (4th Cir. May 16, 2000) ("[B]ecause the parties agree that Maryland law governs their claims, we need not inquire further into the choice-of-law questions.").

"A federal court exercising diversity jurisdiction is obliged to apply the substantive law of the state in which it sits, including the state's choice-of-law rules." Volvo Const. Equip. N. Am., Inc. v. CLM Equip. Co., 386 F.3d 581, 599–600 (4th Cir. 2004) (citing Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79 (1938)). North Carolina law therefore governs the choice-of-law analysis. The North Carolina "Supreme Court has made clear that lex loci delicti ("lex loci") is the appropriate choice of law test to apply to tort claims." Harco Nat'l Ins. Co. v. Grant Thornton LLP, 206 N.C. App. 687, 692, 698 S.E.2d 719, 722 (2010); see Boudreau v. Baughman, 322 N.C. 331, 335, 368 S.E.2d 849, 853–54 (1988). Under this approach, "[t]he law of the place where the injury occurs controls tort claims, because an act has legal significance only if the jurisdiction where it occurs

recognizes that legal rights and obligations ensue from it."
Terry v. Pullman Trailmobile, 92 N.C. App. 687, 690, 376 S.E.2d
47, 49 (1989). "The plaintiff's injury is considered to be
sustained in the state 'where the last act occurred giving rise
to [the] injury.'" Harco, 206 N.C. App. at 694, 698 S.E.2d at
724 (quoting Virginia Bank v. Air-Lift Associates, 79 N.C. App.
315, 321, 339 S.E.2d 90, 94 (1986)).

Aside from the general difficulty in determining where the
last act occurred in a false advertisement case, the North
Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") also
presents its own unique issues in the choice-of-law context. As
one North Carolina court summarized:

> The UDTPA's status as neither wholly tortious nor
> contractual has led to a split of authority within our
> appellate courts on the appropriate conflict of law
> rule to be applied to claims under the UDTPA. Stetser
> v. TAP Pharm. Prods. Inc., 165 N.C. App. 1, 15, 598
> S.E.2d 570, 581 (2004); Compare Andrew Jackson Sales
> v. Bi-Lo Stores, 68 N.C. App. 222, 225, 314 S.E.2d
> 797, 799 (1984) (holding that the "significant
> relationship" test should be applied to UDTPA claims),
> with United Virginia Bank v. Air-Lift Associates, 79
> N.C. App. 315, 321, 339 S.E.2d 90, 93 (1986) (holding
> that in North Carolina, lex loci is the conflict of
> law rule to be applied to UDTPA claims).

Associated Packaging, Inc. v. Jackson Paper Mfg. Co., No. 10 CVS
745, 2012 WL 707038, at *5 (N.C. Super. Ct. Mar. 1, 2012)

In light of these complications in the choice-of-law
analysis and because under either North Carolina or Washington
law summary judgment must be granted in favor of LIA, this court

declines to resolve these difficult choice-of-law question.
Instead, this court's analysis proceeds under both North
Carolina and Washington law for DRI's state law claims against
LIA.

### i. North Carolina Unfair and Deceptive Trade Practice Act (Count II)

A claim under North Carolina's UDTPA, N.C. Gen. Stat.
§ 75-1.1 et seq., requires a showing that "(1) defendants
committed an unfair or deceptive act or practice, (2) in or
affecting commerce and (3) plaintiff was injured as a result."
Phelps-Dickson Builders, L.L.C. v. Amerimann Partners, 172 N.C.
App. 427, 439, 617 S.E.2d 664, 671 (2005). "[A] trade practice
is unfair if it 'is immoral, unethical, oppressive,
unscrupulous, or substantially injurious to consumers.'"
Edwards v. West, 128 N.C. App. 570, 574, 495 S.E.2d 920, 923
(1998) (quoting Johnson v. Phoenix Mut. Life Ins. Co., 300 N.C.
247, 263, 266 S.E.2d 610, 621 (1980), overruled on other
grounds, Myers & Chapman, Inc. v. Thomas G. Evans, Inc., 323
N.C. 559, 374 S.E.2d 385 (1988)). "[A] trade practice is
deceptive if it 'has the capacity or tendency to deceive.'" Id.
(quoting Johnson, 300 N.C. at 265, 266 S.E.2d at 622). "Recovery
will not be had, however, where the complaint fails to
demonstrate that the act of deception proximately resulted in
some adverse impact or actual injury to the plaintiffs." Walker

v. Sloan, 137 N.C. App. 387, 399, 529 S.E.2d 236, 245 (2000).
"[I]t is a question of law for the court as to whether
. . . proven facts constitute an unfair or deceptive trade
practice." United Labs., Inc. v. Kuykendall, 322 N.C. 643, 664,
370 S.E.2d 375, 389 (1988).

Courts have held that a violation of the Lanham Act
necessarily encompasses a violation of North Carolina's UDTPA.
See Universal Furniture Int'l, Inc. v. Collezione Europa USA,
Inc., No. 1:04CV00977, 2007 WL 2712926, at *16 (M.D.N.C.
Sept. 14, 2007), aff'd, 618 F.3d 417 (4th Cir. 2010); Djarum v.
Dhanraj Imports, Inc., 876 F. Supp. 2d 664, 668 (W.D.N.C. 2012)
("North Carolina's [UDTPA] prohibits the same type of activity
that the Lanham Act prohibits . . . ."). A violation of the
Lanham Act is not, however, a necessary prerequisite to finding
a violation under North Carolina's UDTPA. See SMD Software, Inc.
v. EMove, Inc., No. 5:08-CV-403-FL, 2013 WL 5592808, at *6 n.12
(E.D.N.C. Oct. 10, 2013). "Publishing an advertisement which is
neither false nor misleading is not an unfair method of
competition or unfair or deceptive act or practice within the
meaning of [the UDTPA]." Harrington Mfg. Co. v. Powell Mfg.
Co., 38 N.C. App. 393, 400, 248 S.E.2d 739, 744 (1978).

Here, DRI has failed to respond to LIA's summary judgment
motion with respect to the North Carolina UDTPA claim, making it
difficult for this court to ascertain exactly what conduct it

alleges constitutes the UDTPA claim. DRI's response to LIA's motion to dismiss stated that DRI had properly stated a claim under the UDTPA because "Dr. Cory made false, defamatory statements of fact in the <u>Furniture Today</u> article and throughout his crusade across the furniture industry, including his communications with Ashley Furniture accusing DRI of lying about his product." (DRI's Br. in Opp'n to Defs.' Mot. to Dismiss (Doc. 36) at 24.) Because there is no factual dispute as to the content of those statements, this court can decide the UDTPA question as a matter of law. This court finds that neither of the statements constitutes an unfair or deceptive trade practice for the reasons detailed above. <u>See</u> <u>supra</u> Section IV.A. The statements DRI has cited are neither false nor misleading. The Andrews article represents an opinion that is not deceptive either alone or in the larger context of the article. The Gunin article represents an unambiguous, true statement of fact. Therefore, this court finds summary judgment in favor of LIA is appropriate on DRI's UDTPA claim (Count II).

Likewise, with respect to Ashley, the alleged UDTPA violation fails as a matter of law. DRI argues that the "Is It REALLY LEATHER?" ad was literally false. As discussed above, this contention has no merit. DRI also argues that Ashley's internal emails revealed that "it engaged in a smear campaign . . . that specifically targeted DRI and NextLeather®."

(DRI's Resp. to Def. Ashley's Mot. for Summ. J. (Doc. 133) at 33.)

As part of an UDTPA claim, a plaintiff must not only present evidence of damages but also "establish they 'suffered actual injury as a proximate result of defendants' [unfair or deceptive act].'" Strates Shows, Inc. v. Amusements of Am., Inc., 184 N.C. App. 455, 462, 646 S.E.2d 418, 424 (2007) (quoting Edwards v. West, 128 N.C. App. 570, 574, 495 S.E.2d 920, 923 (1998) (citations omitted)). Here, even accepting DRI's characterization of the internal emails from Ashley executive Chris Ross as evidence that Ashley's advertising represented "coordinated attacks on DRI and NextLeather®," (DRI's Resp. to Def. Ashley's Mot. for Summ. J. (Doc. 133) at 31-32), DRI's UDTPA claim still fails. First, these internal emails do not transform the language of the advertisements. DRI has not presented this court with evidence that any viewer of the advertisements believed they referred to NextLeather®. Similarly, DRI has failed to present any evidence that the Ashley advertisements proximately caused a legally cognizable injury to DRI's business. Without such evidence, DRI's UDTPA claim against Ashley cannot withstand summary judgment.

The only evidence in the record remotely linking Ashley's advertisement to a direct injury comes from the affidavit of DRI's owner and president, Alan Naness. In his affidavit, Naness

declares that in early 2007 DRI had more than 25 sample orders from major furniture manufacturers. (Decl. of Alan Naness (Doc. 135) ¶ 9.) Naness further contends that "[a]fter Ashley ran its 'Is it Really Leather?' advertisements . . . few of the manufacturers who had purchased market sample orders from DRI ended up purchasing more NextLeather® to use in manufacturing furniture." (Id. ¶ 11.) However, without any evidence from any of these manufacturers as to their reasons for failing to purchase NextLeather®, Naness' unsupported allegations are insufficient to create a genuine issue. Cf. Barwick v. Celotex Corp., 736 F.2d 946, 963 (4th Cir. 1984) ("Genuine issues of material fact cannot be based on mere speculation or the building of one inference upon another."); Nat'l Enters., Inc. v. Barnes, 201 F.3d 331, 335 (4th Cir. 2000) ("[A] self-serving affidavit . . . is not enough to defeat [a] motion for summary judgment."). DRI has presented no evidence that these manufacturers actually read the advertisements or that they based buying decisions on the advertisements as opposed to any of the other incalculable business reasons for not mass producing a line of products based on a simple sample order. Therefore, summary judgment in favor of Ashley on DRI's claim is required.

### ii. Unfair Competition under the Washington Consumer Protection Act (Count III)

DRI also asserts a claim against LIA under Washington's counterpart to the UDTPA. The Washington Consumer Protection Act ("WCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." Wash. Rev. Code Ann. § 19.86.020 (West). The elements of a claim under the WCPA are: "(1) an unfair or deceptive act or practice, (2) in trade or commerce, (3) that impacts the public interest, (4) which causes injury to the party in his business or property, and (5) which injury is causally linked to the unfair or deceptive act." Indus. Indem. Co. of the Nw., Inc. v. Kallevig, 792 P.2d 520, 528 (Wash. 1990). "[A] communication may contain accurate information yet be deceptive." Panag v. Farmers Ins. Co. of Washington, 204 P.3d 885, 895 (Wash. 2009). "Deception exists 'if there is a representation, omission or practice that is likely to mislead' a reasonable consumer." Id. (quoting Sw. Sunsites, Inc. v. Fed. Trade Comm'n, 785 F.2d 1431, 1435 (9th Cir.1986)). Further, under the WCPA, "a plaintiff would have to establish that but for the defendant's unfair or deceptive act or practice the plaintiff's injury would not have occurred." Indoor Billboard/Washington, Inc. v. Integra Telecom of Washington, Inc., 170 P.3d 10, 21 (Wash. 2007).

For the same reasons previously stated, this court finds that the articles cited by DRI are neither false nor misleading. DRI has also failed to create a genuine issue as to causation. As such, summary judgment must be granted in favor of LIA on Count III.

### iii. __Tortious Interference with Business Relations (Count IV)__

DRI's claim for tortious interference with business relations fails under both North Carolina and Washington law. Under North Carolina law:

> In order to maintain an action for tortious interference with prospective advantage, Plaintiff must show that Defendants induced a third party to refrain from entering into a contract with Plaintiff without justification. <u>Cameron v. New Hanover Memorial Hospital</u>, 58 N.C. App. 414, 440, 293 S.E.2d 901, 917 (1982). Additionally, Plaintiff must show that the contract would have ensued but for Defendants' interference. <u>Id.</u>

<u>DaimlerChrysler Corp. v. Kirkhart</u>, 148 N.C. App. 572, 585, 561 S.E.2d 276, 286 (2002). Further, DRI must identify a "particular contract that a third party has been induced to refrain from entering into with [the] Plaintiff." <u>Id.</u> Here, the closest DRI comes to identifying a specific business relationship lost due to the <u>Furniture Today</u> articles is found in Silver's deposition, where he identifies Macy's as a retailer who failed to purchase bonded leather due to the "controversy and stuff" surrounding the product. (Am. Ex. 6, Silver Dep. (Doc. 153-2) at 85–86.)

However, this statement is insufficient for several reasons. First, the majority of this testimony is hearsay and, therefore, inappropriate to consider at this stage of the litigation. <u>See Maryland Highways Contractors Ass'n, Inc. v. Maryland.</u>, 933 F.2d 1246, 1251 (4th Cir. 1991). Second, DRI has presented no evidence of a particular contract, prospective or otherwise, between DRI and Macy's. Finally, Silver's statements in no way link the quotes in <u>Furniture Today</u> to any purchasing decision of any retailer, including Macy's. Silver's vague references to the "controversy" surrounding bonded leather wholly fail to link Dr. Cory's quotes with a concomitant loss of DRI's potential business relations.

With respect to Ashley, DRI has failed to demonstrate but for causation between the advertisements and the decision to not purchase bonded leather made by the retailers identified in the Naness declaration. Further, DRI has not identified any particular contract Ashley has interfered with that could rise beyond the level of mere expectation or speculation.

For DRI's claim against LIA, Washington law mandates a similar result. A claim for tortious interference under Washington law requires:

> (1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4)

that defendants interfered for an improper purpose or
used improper means; and (5) resultant damage.

Pac. Nw. Shooting Park Ass'n v. City of Sequim, 144 P.3d 276,

280 (Wash. 2006) (quoting Leingang v. Pierce County Med. Bureau,

Inc., 930 P.2d 288, 296 (Wash. 1997)). DRI has not identified a

single contractual relationship or business expectancy that was

lost as a result of Dr. Cory's statements. Moreover, DRI has not

demonstrated LIA had any knowledge of DRI's potential

relationships, and, resultingly, DRI has not presented any

evidence that would allow a jury to find an intentional

interference inducing a breach of contract or a termination of

business relationships.

Therefore, applying either North Carolina or Washington

law, summary judgment is appropriately granted in favor of LIA

and, applying North Carolina law, in favor of Ashley on Count

IV.

### iv.  Civil Conspiracy (Count V)

In support of its claim for civil conspiracy, DRI alleges

that "Defendants combined and conspired with one another and

other DRI competitors to destroy DRI's and NextLeather®'s

reputation and goodwill . . . ." (Compl. (Doc. 1) ¶ 71.) Under

both North Carolina and Washington law, a claim for civil

conspiracy must rest on underlying tortious conduct. See Dove v.

Harvey, 168 N.C. App. 687, 690, 608 S.E.2d 798, 800 (2005) ("We

first note, however, that there is not a separate civil action for civil conspiracy in North Carolina."); All Star Gas, Inc., of Washington v. Bechard, 998 P.2d 367, 372 (Wash. 2000) ("To establish a civil conspiracy, [plaintiff] must prove . . . that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy."); see also Wilson v. State, 929 P.2d 448, 459 (Wash. 1996) ("As we find no evidence of any illegal act by two or more individuals, the civil conspiracy claims also fails."). In other words, civil conspiracy cannot constitute standalone tort.

Here, DRI has failed to establish an underlying tort to support its claim of civil conspiracy. Therefore, summary judgment must be granted in favor of LIA and Ashley on Count V.

> **v. Negligence and Fraudulent Concealment (Count VI) and Negligent Misrepresentation Count (VII)**

Count VI of DRI's Complaint alleges two separate causes of action against LIA, negligence and fraudulent concealment. Count VII of DRI's Complaint asserts a claim for negligent misrepresentation against LIA. Collectively, these causes of action stem a core set of facts; DRI argues that by providing advice via email to DRI, Dr. Cory owed DRI a duty of care in rendering such advice that Dr. Cory breached by: (1) "failing to

disclose and concealing his allegiance to his other clients and

the leather manufacturing industry members of LIA"; (2) taking

"public position contrary to the advice he had given to DRI";

and (3) "calling DRI a fraudster after it followed his advice".

(Compl. (Doc. 1) ¶ 76.) Each of these causes of action

necessitates a finding that a duty was owed:

> "A cause of action for fraud is based on an
> affirmative misrepresentation of a material fact, or a
> failure to disclose a material fact relating to a
> transaction which the parties had a <u>duty</u> to disclose."
> <u>Harton v. Harton</u>, 81 N.C. App. 295, 297, 344 S.E.2d
> 117, 119 (1986) (emphasis added) (citations omitted).
> "Negligence is the failure to exercise proper care in
> the performance of a legal <u>duty</u> which the defendant
> owed the plaintiff under the circumstances surrounding
> them." <u>Moore v. Moore</u>, 268 N.C. 110, 112, 150 S.E.2d
> 75, 77 (1966) (emphasis added). "The tort of negligent
> misrepresentation occurs when a party justifiably
> relies to his detriment on information prepared
> without reasonable care by one who owed the relying
> party a <u>duty</u> of care." <u>Raritan River Steel Co. v.
> Cherry, Bekaert & Holland</u>, 322 N.C. 200, 206, 367
> S.E.2d 609, 612 (1988) (emphasis added).

<u>Oberlin Capital, L.P. v. Slavin</u>, 147 N.C. App. 52, 58, 554

S.E.2d 840, 846 (2001).

Washington law also requires a legal duty to maintain a

claim under any of these causes of actions. <u>See</u> <u>Richland Sch.

Dist. v. Mabton Sch. Dist.</u>, 45 P.3d 580, 585 (Wash. 2002) ("In

order to sustain a claim under these [negligent

misrepresentation] sections, the plaintiff must establish, in

part, a duty to disclose or to provide accurate information.");

<u>Stiley v. Block</u>, 925 P.2d 194, 209 (Wash. 1996) ("Where the law

imposes a duty on one party to disclose all material facts known to him and not known to the other, silence or concealment in violation of this duty with intent to deceive will amount to fraud as being a deliberate suppression of the truth and equivalent to the assertion of a falsehood. The concealment of the fact which one is bound to disclose is an indirect representation that such fact does not exist, and constitutes fraud." (quoting Oates v. Taylor, 199 P.2d 924, 927 (Wash. 1948))).

"Duty is a question of law, while breach and proximate cause are generally questions of fact for the jury." Richland Sch. Dist., 45 P.3d at 588; see Carsanaro v. Colvin, 215 N.C. App. 455, 460, 716 S.E.2d 40, 45 (2011).

Here, Dan Peplinski, DRI's Chief Operating Officer, emailed Dr. Cory, briefly described the composition of a new product, and asked if the new product could "still be characterized as leather in the USA?" (Neeleman Decl., Ex. C, Email Conversation (Doc. 107-1) at 27-28.) Based on the email description, Dr. Cory responded "ABSOLUTELY NOT!" and advised Mr. Peplinski that the "material needs to be labeled as: 1) 'Not leather', or; 2) 'Reconstituted leather' or 'Bonded leather.'" (Id. at 26.) This email exchange represents the entire extent of Dr. Cory's "marketing advice" to DRI. DRI contends that Dr. Cory breached

his duty of care owed to DRI by taking a public opinion in the
Furniture Today articles contrary to his email.

Specifically, DRI alleges that Dr. Cory breached "his
professional duty of care." (DRI's Resp. to Def. LIA's Mot. for
Summ. J. (Doc. 132) at 32.) However, DRI has not cited, nor can
this court find, any authority for the proposition that a
testing facility owes a legal duty to refrain from expressing
opinions (arguably) contradicting advice given to a prior
client. Similarly, DRI has not highlighted a single material
omission which LIA had duty to disclose.[12] Moreover, DRI has not
argued or produced evidence showing the standard of care of a
reasonable chemist or testing facility that was allegedly not

---

[12] Based on DRI's response to LIA's motion for summary
judgment (Doc. 132), it is unclear to the court the extent DRI
wishes to advance all of the causes of action stated in Counts
VI through VIII, except negligent representation. DRI's response
only refers to negligent misrepresentation and cites a single
case which lists the basic elements of negligent
misrepresentation. (DRI's Resp. to Def. LIA's Mot. for Summ. J.
(Doc. 132) at 32-33.) Within the scope of negligent
misrepresentation, DRI limits its argument to Dr. Cory's
statements in Furniture Today being contrary to Dr. Cory's prior
email to Dan Peplinski. Due to DRI's failure to brief the other
issues, this court will only briefly address why summary
judgment is appropriate in favor of LIA on each. See Harris v.
hhgregg, Inc., No. 1:11CV813, 2013 WL 1331166, at *4 (M.D.N.C.
Mar. 29, 2013) ("When a party fails to respond to a summary
judgment motion regarding a claim, the party essentially
concedes that summary judgment in favor of the moving party is
appropriate."); Local Rule 56.1(d). But see Custer v. Pan Am.
Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993) (requiring a
party to still carry its burden under Fed. R. Civ. P. 56 even if
the opposing party fails to respond to a summary judgment
motion).

met. See Reich v. Price, 110 N.C. App. 255, 259, 429 S.E.2d 372, 375 (1993) ("One who undertakes to render services in the practice of a profession owes a duty to exercise that degree of skill, care, and diligence exercised by members of that same profession."). Because DRI has failed to establish a legal duty owed, summary judgment in favor of LIA is appropriate on the various claims encompassed by Counts VI and VII.

### vi.  Breach of Contract/Breach of Duty of Good Faith and Fair Dealing (Count VIII)

"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." Poor v. Hill, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000); see Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus., 899 P.2d 6, 9 (Wash. 1995) ("A breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant.").

Here, DRI has failed to present to this court any evidence of a contract or related breach. DRI's response to LIA's motion for summary judgment (Doc. 132) does not identify any contractual relationship between Dr. Cory or LIA and DRI. Similarly, even assuming a contractual relationship between the parties, DRI has not identified any provision that would have precluded Dr. Cory from stating his opinions on bonded leather

in Furniture Today. Therefore, DRI cannot maintain its claim for breach of contract.

While "the duty of good faith and fair dealing is implied in every contract," Carlile v. Harbour Homes, Inc., 194 P.3d 280, 291 (Wash. 2008), Washington courts have required a claim for breach of good faith to be tethered to an underlying contract provision. See id. ("[T]here is no free-floating duty of good faith and fair dealing that is unattached to an existing contract." (internal quotation marks omitted)). "The duty exists only 'in relation to performance of a specific contract term.'" Keystone Land & Dev. Co. v. Xerox Corp., 94 P.3d 945, 949 (Wash. 2004) (quoting Badgett v. Sec. State Bank, 807 P.2d 356, 360 (Wash. 1991)). Because DRI has failed to identify a contract or provision applicable to the present controversy, Washington law does not support an independent claim for good faith and fair dealing.

North Carolina courts have recognized a separate cause of action for a breach of the duty of good faith independent from a breach of contract. See Richardson v. Bank of America, 182 N.C. App. 531, 556-57, 643 S.E.2d 410, 426-27 (2007). However, DRI has failed to argue such point, and this court can uncover no authority that would support such a claim on the facts before it. Therefore, summary judgment is appropriate on Claim VIII.

### vii. **Punitive Damages (Count IX)**

Under North Carolina law, "punitive damages can only arise in connection with the tortious act; it may not constitute a separate cause of action." E.g., Paris v. Michael Kreitz, Jr., P.A., 75 N.C. App. 365, 374, 331 S.E.2d 234, 241 (1985). Washington law does not permit punitive damages unless expressly authorized by statute. E.g., Dailey v. N. Coast Life Ins. Co., 919 P.2d 589, 590-91 (Wash. 1996). Because there is no surviving tort claim or statutory violation to base DRI's claim of punitive damages, summary judgment must be granted on Count IX in favor of both defendants.

## V. **CONCLUSION**

For the reasons set forth herein, **IT IS HEREBY ORDERED** that Plaintiff Design Resources, Inc.'s Motion for Partial Summary Judgment against Defendant Leather Industries of America (Doc. 102) is **DENIED**, that Plaintiff Design Resources, Inc.'s Motion for Partial Summary Judgment against Defendant Ashley Furniture Industries, Inc. (Doc. 104) is **DENIED**, that Defendant Leather Industries of America's Motion for Summary Judgment as to All Counts (Doc. 123) is **GRANTED**, that Defendant Ashley Furniture's Motion for Summary Judgment (Doc. 119) is **GRANTED,** and that this action is dismissed.

**IT IS FURTHER ORDERED** that Defendant Ashley Furniture's consent motion for extension of time (Doc. 95) to file a

response to Plaintiff's motion for relief, the parties' joint motion to modify limitations on length of summary judgment briefs (Doc. 116), and the parties' agreed motion to extend deadline (Doc. 161) are **GRANTED.**

For the reasons stated in this paragraph, **IT IS FURTHER ORDERED** that Plaintiff Design Resources, Inc.'s motion for relief from Ashley's spoliation of evidence (Doc. 86) is **DENIED AS MOOT** (evidence would go to Ashley's intent and is not relevant to this order); Defendant Ashley Furniture's motion to strike (Doc. 150) is **DENIED AS MOOT**; Defendant Leather Industries of America's motion for leave to file a supplemental memorandum (Doc. 154) is **DENIED AS MOOT** (email from Peplinski was considered in reaching conclusion; summary judgment was granted in favor of LIA); Defendant Ashley Furniture's motion to exclude the expert testimony of Mann, Armistead, and Epperson (Doc. 170) is **DENIED AS MOOT** (relevant to damages, not liability); Defendant Ashley Furniture's motion to strike untimely expert reports of Mann, Armistead, and Epperson (Doc. 172) is **DENIED AS MOOT** (damages); Defendant Leather Industries of America's motion to exclude the testimony of Design Resources, Inc.'s proposed experts (Doc. 175) is **DENIED AS MOOT** (damages); and Ashley's motion to strike surreply and declaration of Jerry Epperson (Doc. 205) is **DENIED AS MOOT** (damages).

This the 19th day of August, 2014.

_____
United States District Judge